EDWARD BRADFIELD v. JAMES D. DEWELL, CORNELIUS K. RUSSELL, WILLIAM CURRIE, WILLIAM BENNETT AND THOMAS C. BROADBENT.

*Water rights—Maintenance of dams by grantees of water-power—Obstruction of flow, and extravagant use.*

In 1864 a riparian proprietor, upon the Thornapple river, built a brush dam across the river whereby the water was forced through a certain canal, and then sold the right to take through the canal water sufficient for four runs of stone in a flouring mill. By means of the

power thus obtained a mill below the dam has ever since been operated. In the conveyance the whole quantity of water in the river was estimated as sufficient for sixteen runs of stone. Subsequently a sale was made to others of the right to draw from the canal sufficient to operate three runs of stone; and a mill was erected above the other to be operated by the power purchased. Under each grant the grantee was under obligation to bear his just proportion of the expense of keeping the dam in repair.

In 1877 the proprietor of the lower mill filed his bill against the proprietors of the upper mill, claiming that the defendants by certain obstructions in the canal, some of which were put in "soon after" the grant in 1864, were preventing the flow to him of the full quantity of water to which he was entitled, and were also depriving him of his just quantity by extravagant use, and that they neglected and refused to bear their proportion of the cost of repairs, though he at all times bore and paid his proportion, which was one-fourth of the cost ; and praying for an injunction to restrain the defendants from continuing such obstructions, and from such extravagant use of water, etc.

Upon this bill and upon the evidence in support of the same the court made a decree reciting that complainant was entitled to the first right in the use of the water to the extent of sufficient for four runs of stone; that his just proportion of the cost of keeping up the dam was one-fourth; that the flow of water in the canal to complainant's mill was improperly obstructed, and that defendants had wrongfully drawn away and diverted water from him; and perpetually enjoining defendants from interrupting or interfering with the flow of water to complainant's mill sufficient for four runs of mill-stones, and from interrupting or interfering with the first right to the use of said supply of water by complainant at all times, and from placing obstructions in the canal or maintaining any already there whereby the supply of water to complainant's mill would be wholly or partially interfered with.

*Held*, that this decree was erroneous.

The just proportion which complainant should bear of the cost of repairs would be the proportion which the water to which he was entitled bore to the whole quantity in the river if all was used. There was evidence in the case that the water in the river was sufficient, not for sixteen runs of stone, but for ten only; and complainant's proportion would, therefore, be two-fifths of all if all the water was used. But it appearing that use was made of the water by complainant and defendants only, and that the dam was kept up only for their use, and their rights in the water were respectively as four to three: *Held*, that the cost of maintaining the dam should, as between them, be borne in this proportion.

The decree was erroneous for indefiniteness as to the obstruction to be removed, and also because apparently it included obstructions that had existed for many years before the suit was instituted, and which, if unwarranted, should long ago have been complained of.

The decree was erroneous also, because it assumed that complainant's right to a certain proportion of the water was absolute and unconditional; whereas it was a right dependent on his doing his share towards keeping the dam in repair.

*Held further*, that considering the nature of the structure to be maintained, the liability to perpetual controversies concerning the performance by the parties respectively of their duties in regard to it, and concerning the use or waste of water by them, and the necessity that would exist that the court, if it assumed jurisdiction and awarded an injunction, should have perpetual oversight in respect to the conduct enjoined, the case was not a proper one for equitable jurisdiction, and that complainant should find his remedy at law.

Appeal from Kent. Submitted Jan. 20. Decided April 5.

INJUNCTION bill. Defendants appeal. Reversed; bill dismissed.

*Godwin & Earle* and *J. W. Champlin* for complainant, cited in support of the decree granting relief: *Brown v. Bush* 45 Penn. St. 61; *Stackpole v. Curtis* 32 Me. 383; *Seneca Woolen Mills v. Tillman* 2 Barb. Ch. 9; *Brace v. Yale* 4 Allen 393; *Leggett v. Kerton* 2 Rich. (S. C.) 156; *Goodrich v. Longley* 4 Gray 383; *Lyon v. McLaughlin* 32 Vt. 423.

*Blair, Kingsley & Kleinhans*, for defendants, cited *Batavia Manufacturing Co. v. Newton Wagon Co.* 91 Ill. 243; *Hoxsie v. Hoxsie* 38 Mich. 78.

COOLEY, J. This is an injunction bill. The object is to have the rights of complainant in the water-power of the Thornapple river at Ada declared and protected, and certain obstructions which are said to be maintained by the defendants in the mill-race at that point removed.

The bill was filed July 30, 1877. It sets forth that prior to July 19, 1858, one Samuel Clements was owner in fee-simple of a certain parcel of land particularly described,

lying upon the Thornapple river, together with a grist mill and flumes erected thereon, with the first right of use of the water from the adjacent mill race sufficient for four run of millstone, with the necessary machinery for a grist and flouring mill by the use of water-wheels that should be as economical in the use of water as those in use in said mill on the day last aforesaid.

That the said mill was then used as a grist and flouring mill and was operated by means of said water-power, and from that time has been so continuously operated.

That the Thornapple river flowed by and through said land, and there was a dam across the same above said land which created a pond from which the water was conducted by a race to and through said mill, and created the motive power by which the mill was operated.

That on the day mentioned Clements sold and conveyed all said described property by warranty deed to Electa Bradfield, and on the fourteenth day of October, 1870, Electa Bradfield by like deed sold and conveyed the same to complainant.

That by virtue of said conveyances, complainant became on the day last mentioned and still is the owner of the first right and interest in the water of the Thornapple river as it flows and of right ought to flow through said race, in amount sufficient at all times and in all seasons to propel four runs of millstones, with the necessary gearing and machinery for a grist and flouring mill by the use of water-wheels as economical in the use of water as those in use in said mill on said premises on July 19, 1858.

That on said October 14, 1870, complainant formed with others the partnership known as E. Bradfield & Sons, which ever since has been running and operating said grist and flouring mill.

That some time after said conveyance by said Clements to Electa Bradfield other parties purchased some land and some right to use water from said river and said race, out of what there should be beyond that so conveyed to her, and erected a mill upon said race above complainant's mill, and that the

mill so erected has ever since been operated by means of water taken from said race as the motive power; and since the water comes from said mill before it reaches complainant's mill, the owners thereof have an opportunity to use and control the water flowing in the race.

That in the month of February, 1872, said upper mill property was purchased by and conveyed to James D. Dewell, and on July 1, 1876, Cornelius K. Russell became joint owner with him.

That ever since said purchase by Dewell he and others acting with him have kept, supported and maintained in said race a large amount and variety of obstructions to the running and flowing of the water therein to complainant's mill; the obstructions consisting of posts, timber, stones, etc.; and that by means thereof, said Dewell and his associates have so detained the water as to prevent complainant obtaining the quantity to which he is entitled, and he has been greatly obstructed and injured in his business in consequence.

That said Russell was then engaged in making some radical change in said premises, and in making excavations and embankments, and putting in a stone wall evidently intended to be permanent, and with the aid of said stone wall and embankments was filling and blocking up the channel and race so as seriously to impede the flow of water to complainant's mill, and that complainant had remonstrated without avail.

And the bill prayed that said Dewell and Russell "be restrained from keeping, maintaining and supporting any obstructions to the flow of water through said race to your orator's mill in amount sufficient to equal what is owned by your orator, and from using any of the water belonging to your orator and from preventing in any manner the coming to your orator's said mill through said race at all times the amount of water so owned by your orator, and water enough to propel four runs of millstones with the necessary gearing and machinery for a grist and flouring mill using wheels as economical in the use of water as those in use in said mill

on the 14th day of February, 1858, and that they be compelled to remove or allow your orator to remove all obstructions that interfere with the flow of the water owned by your orator to your orator's said mill." By supplemental bill William Currie, William Bennett and Thomas C. Broadbent were brought in as additional defendants, as having acquired interests in the upper mill property during the pendency of the suit.

The defendant Bennett answered and disclaimed, and the bill as to him was dismissed. The other defendants answered to the merits. They admitted the conveyances under which the complainant claimed, and the purchases and occupation by themselves, but they denied that they had ever encroached upon his rights. They charge him with great and extravagant waste in the use of the water, and with neglect and refusal to do his share and pay his proportion towards keeping the dam in condition for use, and aver that there has been at all times since the mills were built an abundance of water running and flowing in the Thornapple river to supply both of said mills with all the water that they are entitled to use if the dam was kept properly in repair, and the head of water kept at six feet as was originally contemplated. They aver their own readiness to contribute their proportion to the repairs at all times; and deny that any obstructions by them maintained materially obstruct the flow of water to complainant's mill.

Voluminous testimony has been taken in the case, from which it appears that the dam by means of which the power in question is obtained is what is known as a brush dam, made of brush held in place by earth and stones; that by the contract under which it was originally constructed it was to raise the water six feet above low-water mark, and it could not be raised higher without interference with the rights of third parties; that the dam is likely to need annual repairs; and that in respect to what was needed and the cost of making them the parties have had frequent and angry controversies. On his part complainant produced evidence to show that for several years he had been unable

in his mill to do nearly so much business as formerly, which he attributed to the water being wrongfully obstructed or drawn off by defendants, while they on their part produced evidence to show that it was due to his wasteful use of water, and his failure to unite with them in repairs.

To an understanding of what follows it will be necessary to give the decree in full.* The recitals in the decree, it will be seen, go quite beyond those contained in the bill.

---

* THE DECREE.

"This cause came on to be heard on the pleadings and proofs therein, and was argued by counsel, and the court, having considered the same, doth find and declare that on the nineteenth day of July, A. D. 1858, Samuel Clements was the owner of certain land and water-power at Ada, in said county of Kent, created by a dam constructed across Thornapple river, and of a grist-mill, mill-race or flume connected therewith; that said grist-mill was propelled by water-power, which water was conducted from said dam by means of a race or flume to said mill; that the water-wheels then in use in said mill were what is known as the "Yale wheel;" that on the said nineteenth day of July, A. D. 1858, the said Samuel Clements did, by warranty deed, for the consideration of 5037.18-100 dollars sell and convey to Electa Bradfield parcel of his said lands and water-power, described as follows: All that certain piece or parcel of land situated in the township of Ada, Kent county and State of Michigan, and being a part of section thirty-four (34), of township seven (7) north, of range ten (10) west, and bounded and described as follows, to-wit: Commencing at a stake on the south line of the Detroit & Milwaukee Railway 148 feet eastwardly from the center of the first road crossing east of the Thornapple river, and running west 19 degrees south 19 rods and 9 links to a hackberry tree on the right bank of the Thornapple river; thence down said river, on the right bank thereof, to the south line of the aforesaid railway; thence eastwardly along said line to the place of beginning; together with the grist-mill and flume erected on said premises, with the first right of use to the water from the adjacent mill-race sufficient for four runs of millstones, with the necessary machinery for a grist and flouring mill, by the use of water-wheels that shall be as economical in the use of water as those now in use in said mill; (reserving to the party of the first part the free right of ingress and egress across said premises, on the south side thereof; and further, the right to cut a race, or erect a flume, across said premises, provided such race or flume shall not obstruct the discharge of water from said grist-mill or interfere with the privileges of said mill); provided further, that the water-power herein conveyed to the party of the second part, shall at all times be subject to assessment of its just proportion of all expenses for repairs on the dam and mill-race that supplies it with water, it being understood by the parties thereto that the whole amount of water in the stream (Thornapple river) is estimated as sufficient for 16 runs of millstones; that said deed was duly recorded in the office of the register of deeds, for the county of Kent, on the 6th day of September, A. D. 1858, in liber 13 of deeds, on pages 219, 220 and 221.

"And this court doth further find and declare that afterwards, on the 18th day of October, A. D. 1864, said Samuel Clements did, by warranty deed, for the consideration of $2000, sell and convey to Shadrack Small, Jr., other parcels of said lands and water-power described as follows: Lots four (4) and five (5), in block four (4), bounded as follows:

The date of the decree is December 23, 1880. From its recitals it appears that some of the wrongful obstructions to the flow of the water to complainant's mill were made "soon after" the conveyance by Clements to Small in October, 1864, and presumably therefore long before defendants had possession or were claiming rights in the property. The decree is a mandatory injunction for the removal of these, though they are not specifically described or even referred to in the bill. To justify equitable interference after so great a lapse of time, a very strong case ought to be

Beginning at the southeast corner of land deeded to E. Bradfield, known as lot six (6) in said block four (4), on the south line of the Detroit & Milwaukee Railway; thence east 36 degrees south along said railway line (excepting two rods wide for a street known in the plat of the village of South Ada as Mill street) 17½ rods or thereabouts; thence south 36 degrees west about 9 rods from said railway line to the right bank of the Thornapple river; thence following the meanderings of said river at low-water mark and down said stream to the point where the land of E. Bradfield intersects said river; thence east 19 degrees north along said line to the place of beginning, together with the saw-mill situated on lot five aforesaid, with the fixtures and appurtenances and water to be drawn from the mill-race on said lot sufficient for three runs of millstones, with necessary machinery for a grist-mill and flouring-mill; reserving to the party of the first part, his heirs and assigns, the right to cut a mill-race across said lot 5, block 4, forty feet in width, for the purpose of conveying water from the mill-pond to propel machinery; the party of the first part, his heirs and assigns, to bridge said mill-race (when so cut) sufficiently for a roadway for loaded teams, and to keep said bridge in repair; also lot 6 in block 1 in the said village of South Ada, reference being hereby made to the recorded plat thereof, in the office of the register of deeds for said county of Kent, for all descriptions of lots and blocks in the foregoing description; the same being lots four (4) and five (5), in block four (4); also lot six (6) in block one (1), according to said plat; and further, the small building now situated on lot five (5), in block one (1), is embraced in the above purchase of the party of the second part.

"This court doth further find and declare that by two deeds, one dated October 14th, 1870, and recorded May 11th, 1872, and the other dated February 14th, 1875, and recorded February 19th, 1875, all the rights, title and interest of the said Electa Bradfield in the premises and water-power first above described were conveyed to and became vested in Edward Bradfield, the complainant in this suit. And by deed dated August 17th, A.D. 1868, and recorded August 18th, 1868, Shadrack Small, Jr., conveyed all of his right, title and interest in the premises second above described, to Eliphalet Averill, in trust for himself and Nathan T. Bushnell and James D. Dewell, composing the partnership firm of E. Averill & Co., and on the 24th day of April, 1871, the said Eliphalet Averill personally, and also as trustee for himself and Nathan T. Bushnell and James D. Dewell composing the partnership firm of E. Averill & Co., by deed of that date and recorded April 25th, 1871, conveyed said premises as above secondly described to Nathan T. Bushnell and James D. Dewell; and that on the seventh day of February, 1872. said Nathan T Bushnell did by deed recorded February 29th, 1872, convey said premises to James

made by the bill; and it ought either to be shown that complainant protested at the outset, or that circumstances existed which excused the failure to protest. The reasons which excuse the delay in applying for redress ought also to have been set forth. In the record we find evidence tending to explain and excuse the great delay, but there are no averments in the bill to which the evidence is applicable.

One method of testing whether a mandatory injunction is proper in the case may be to consider what the proceedings would be if it were claimed that its command was not

---

D. Dewell; and that on the first day of July, 1876, said James D. Dewell did by deed recorded on the 18th day of August, 1876, convey to Cornelius K. Russell an undivided half of the said premises; and that on the 19th day of July, 1879, said James D. Dewell and Cornelius K. Russell did by deed convey said premises to William Currie; and that the defendant Thomas C. Broadbent was, at the time of the filing the supplemental bill in this cause, using and operating the mill erected on said last described premises, under said other defendants. or one of them, and has diverted the water from said race of which said complainant was entitled to the first use, so as to prevent said complainant from receiving the quantity of water he is entitled to under said deed.

"The court doth further find and declare that the complainant, Edward Bradfield, is, and since the fourteenth day of October, 1870, has been entitled to the free and uninterrupted enjoyment of the supply of water from the race or flume mentioned in said deed from Samuel Clements to Electa Bradfield sufficient for four runs of millstones with the necessary machinery for a grist and flouring mill by the use of water-wheels that are as economical in the use of water as the wheels in use in said mill on the 19th day of July, 1858, and doth further declare that complainant's right to use said quantity of water is first and superior at all times to that of defendants to use water from said race or canal at any and all stages of water in said Thornapple river or in said race. That the said water-power conveyed by said deed from Samuel Clements to Electa Bradfield, and the complainant's rights thereunder, is subject to assessment of its just proportion of all expenses for repairs on the dam and mill-race, which this court doth declare to be one-fourth part of such expense, and the court finds that said-complainant has always been ready and willing, and has paid his just proportion of all expenses for repairs on the said dam and mill-race.

"And the court doth further find and declare that at the time of the execution of the deed from Samuel Clements to Electa Bradfield the water which furnished the power for the mill therein conveyed was conducted to the mill by means of a race from the pond caused by the dam across Thornapple river, near the upper end of which race were head-gates to regulate the flow of water into said race; there was another head-gate to the flume of the mill at the lower end of the race, and near the mill conveyed by said deed. The distance between these head-gates was and is 113 feet; that soon after the date of the deed from Samuel Clements to Shadrack Small, Jr., said Small erected a grist and flouring mill on said race, the superstructure of which extended entirely across said race, and was 36 feet in width, and a distance of 22 feet from the upper head-gates of said race. That portion of the mill which is over the race

obeyed. One branch of the injunction is that the defend-
ants be restrained from "maintaining any obstructions in
said race" whereby complainant's right to the use of the speci-
fied quantity of water may be wholly or partially interfered
with. This must refer in part at least to the obstructions
created by Small, and perhaps these are sufficiently described
in the decree so that, if their removal were ordered, the
decree would be a sufficient guide for the purpose. Their
removal, however, is not ordered; only their maintenance is
forbidden if it interferes with the passage to complainant's

---

is supported by two rows of posts, four posts in each row, extending
from the bottom of the race to the mill above. On the right bank of the
race the mill is supported by a stone wall, and in the race and adjoining
the stone wall are six posts. The stone wall at the lower end makes a
right angle and projects three feet into the canal or race. The water used
to propel the wheels of this mill is drawn from the race through gates
directly under the mill. Soon after the mill was erected by Small the
water broke through under the gates of his mill, and he thereupon filled
in with plank, stone and gravel, the race along in front of his gates, the
bottom of the race nearly three feet deep, and extending back near to the
center of said race. There are two bridges across said race adjoining
said mill, one on the upper side, which is supported by two posts extend-
ing from the bottom of said race, and one on the lower side of said mill
is supported by three posts extending from the bottom of said race.

" And this court doth further find and declare that the filling in of said
race, and the said posts and stone wall erected and maintained in said
mill-race, are obstructions to the free and uninterrupted flow of water in
said mill-race to said complainant's mill, and in low stages of water in
said mill-race interferes with and obstructs the free flow of said water
to complainant's mill to such an extent as to deprive him of the quantity
of water secured to him by said deed from Samuel Clements to said
Electa Bradfield. That said obstructions were not placed in said race by
or with the consent or assent of said Electa Bradfield or said complainant,
but against their protest.

" And this court doth further find and declare that the said defendants,
James D. Dewell, Cornelius K. Russell, William Currie and Thomas C.
Broadbent, have drawn away through their gates the waters from said
mill-race and diverted the same from the said complainant's mill during
the times set forth in said complainant's original and supplemental bills
of complaint so that said complainant has not had sufficient water from
said mill-race for four runs of millstones with the necessary machinery
for a grist and flouring mill by the use of water-wheels that were as
economical in the use of water as those in use in said mill on the
19th day of July, 1858, and have interfered with the rights of said
complainant to the first right to use the water from said mill-race within
the limits and quantities granted in and by said deed from Samuel Clem-
ents to said Electa Bradfield by diverting said water from said mill-race,
and drawing the same from said mill-race through their gates under their
said mill, as well as by maintaining said obstructions in said mill-race as
aforesaid.

" And this court doth further find that the wheels in use by complain-
ant during the time mentioned in said bill of complaint were and are as

.mill of the water to which he is entitled.   But the defend-
ants are further enjoined " from interrupting or interfering
with the said supply of water for complainant's mill from
said mill-race sufficient for four runs of mill-stones, with the
necessary machinery for a grist and flouring mill by the use
of water-wheels that shall be as economical in the use of
water as those in use in said grist-mill at the date of the
deed from Samuel Clements to Electa Bradfield," etc.   If,
therefore, the complainant were to claim at any time here-
after that by some disregard of the injunction he failed to
receive the requisite quantity of water, and were to move
for an attachment, there would not only arise on that motion

---

economical in the use of water as were those in use in said mill on the
19th day of July, A. D. 1858, and that he has not used and does
not use water exceeding the quantity to which he is entitled under said
grant from said Samuel Clements to Electa Bradfield.

"And this court doth adjudge and decree that the bill of complainant
be dismissed as to the defendant William Bennett, and that he recover as
costs against the complainant a solicitor's fee of thirty dollars.

"And it is ordered, adjudged and decreed that the said defendants,
James D. Dewell, Cornelius K. Russell, William Currie and Thomas C.
Broadbent, their agents and servants and each of them be and are per-
petually enjoined and restrained from interrupting or interfering with
the said supply of water for complainant's mill from said mill-race suffi-
cient for four runs of millstones, with the necessary machinery for a grist
and flouring mill by the use of water-wheels that shall be as economical
in the use of water as those in use in said grist-mill at the date of the
deed from Samuel Clements to Electa Bradfield, namely, July 19th, A. D.
1858, and from interrupting or interfering with the first right to the use
of said supply of water by said complainant at any and all times, and
from diverting or drawing off said water from said mill-race so as to
interrupt or interfere with said supply of water or the first right to the
use thereof at complainant's mill.

"And the said defendants, James D. Dewell, Cornelius K. Russell and
William Currie are hereby enjoined and restrained from placing obstruc-
tions in said race and from maintaining any obstructions in said race
whereby said supply of water is or may be wholly or partially interfered
with, and from in anywise infringing or permitting to be infringed said
complainant's right to said supply of water.   But nothing in this order
or decree is to extend to diminish, lessen, hinder or prejudice the using
or enjoying by defendants the water and rights granted by Samuel Clem-
ents to Shadrack Small, Jr., by deed bearing date October 18th, 1864, out
of any surplus of water there may be in said mill-race over and above
the supply and rights as herein declared granted by said Clements to
Electa Bradfield by deed dated July 19th, 1858.   And it is further ordered
and decreed that a writ of injunction be issued in accordance with this
decree enjoining and restraining the said defendants as aforesaid.

"And it is further ordered that complainant do recover of the said
defendants, Dewell, Russell, Currie and Broadbent, his costs of this suit
to be taxed, and that he have execution therefor."

                              BIRNEY HOYT, Circuit Judge.

the question whether his machinery was as economical in the use of water as his grant requires, but if that was decided in his favor, then the further question whether the failure to receive the water was due to obstructions created or maintained by the defendants. The decree points out no method of determining when the exigency of the injunction is complied with; there is nothing definite in its provisions except that the flow of water sufficient to accomplish a certain result shall not be interfered with; and the result itself is to depend upon machinery in respect to which there may be frequent occasion for repairs or changes, so as to open anew the questions of fact which are largely considered in the record in respect to the economy of the machinery in the use of water.

But an insuperable difficulty with the decree is, that while in its recitals it recognizes the fact that complainant is under obligation to bear a certain proportion of the expense of repairing the dam, the mandatory clauses assume that complainant has an absolute and unqualified right to the specified quantity of water to be drawn from the race, and forbid any obstructions by defendants that will interfere with the flow to him. What has already been said is sufficient to show that complainant has no such absolute right. He is not only under obligation to bear his proportion of the cost of repairs, but his right to use the water is qualified by the obligation. If therefore the defendants should perform their duty in respect to repairs, and complainant should fail to perform his, it may be that the defendants would be entirely justified in operating their mill with the water from the race, even though the complainant failed to obtain the quantity specified in his conveyance, or any quantity whatever sufficient for any valuable purpose. Any question of a breach of the injunction is therefore complicated, not merely with the other questions which have been referred to, but also with questions concerning the performance by the respective parties of their obligations to repair.

If the dam were a substantial and permanent structure, of definite form and height, needing repairs but seldom and.

under exceptional circumstances, the obligation to divide the cost of repairs might not raise any very troublesome questions after the relative proportion of the cost was once determined. But this dam is one of those primitive structures which, though answering a valuable purpose, is very well calculated to be a source of perpetual contention when there are interests in common in it. It is always expected to be leaky, and is very liable to be partly washed out in freshets. This dam has always been the occasion for dispute and controversy. It does not appear from the evidence that there is any known and understood standard of excellence for a brush dam, and it is very certain that the parties have never agreed upon any. At times they have disagreed respecting the height at which it should be maintained; they had a right to keep it at six feet, but were not under obligation to do so. Each was interested that it should give him the quantity of water required for his mill, and when complainant failed to obtain his proportion, the question of the responsibility for this involved of necessity the matter of repairs quite as much as the matter of obstructions.

But in order to understand all the difficulties of the controversy it is necessary to consider that complainant is or may be interested in an economical use of water by defendants, as much as they are in an economical use of the water by him. He has the first right; but there seems to be water enough in the river for all, and all are to be supplied by means of a dam maintained at the common cost. This dam should give them water through the race sufficient for seven runs of stone; and complainant cannot be required by defendants to do more than to assist in keeping up a dam sufficient for three runs of stone in addition to his own quantity. Having the first right he is personally interested only in having a dam sufficient to supply him, and a poor, imperfect and leaky dam might therefore answer his purposes if all the water which it turned into the race was suffered to flow to his mill. The interest of the defendants begins where his interest ceases; as they require for their purposes a dam that shall give them water sufficient for

three runs of stone after his greater quantity has been furnished. The dam that answers his purpose may not therefore answer theirs; and if the quantity supplied by the dam constructed jointly proves insufficient for the purposes of both, there is the same opportunity for complainant to raise a controversy over excessive or extravagant use of water by the defendants that they have to accuse him of the like excess or extravagance.

A decree should define with precision the rights which it assumes to declare and protect. The necessity for this is especially imperative when as a part of the relief given a mandatory injunction is awarded for the demolition of structures which have long existed. A decree which requires the defendants to suffer water to flow to complainant sufficient to accomplish a certain result, when his right to it is dependent on contingencies not specified and which require important action by himself, is wanting in the precision requisite for a judicial determination of rights. How is the court to give effect to such a decree as we have before us? If what was required was that the parties should jointly maintain a dam that should give a certain head of water, or that should cause a certain quantity in a specified time to flow through a defined canal, and then that the parties should share the water in specified proportions, there would be in the case elements of certainty which would be guides to the parties and also to the officers of the court, if the intervention of the court should ever be called for in the enforcement of the decree. But no such elements of certainty are to be found in the mandatory clauses of this decree. As has been already pointed out the decree fails to define the obligation of complainant to make repairs, upon which his right to water at any time may depend. Without enjoining the performance of that obligation the decree is quite as likely to breed new litigation as to put an end to that which before existed; for the real trouble in the case was as much to be looked for in an insufficient or defective dam as in an improper appropriation of the results of the dam. The dam then required the attention of the court as

much as the alleged wasteful appropriation of the water which the dam turned into the race. Unless a dam was maintained which would give to the complainant the quantity of water to which he was entitled, the removal of obstructions from the race could not possibly give him effectual redress. And if, by the fault of both parties, or of complainant alone, the dam should fail to turn through the race the quantity required by both, the defendants might have as much and possibly a better right to what should flow in the race, than the complainant could have under the circumstances. If so they would be justified in appropriating it notwithstanding this undiscriminating decree. A judgment in the case of such common rights, which is intended not only as a settlement of present controversy, but as a guide for the future, should be as particular to define the rights and obligations of one party as of the other, and should not assume that the violations of right will be on one side exclusively.

But we think the complainant has been wholly in error in his view of the extent of the obligation resting upon him to make repairs. The error has sprung from the peculiar terms employed in the deed from Clements to Electa Bradfield. That deed conveyed the right to take from the race water sufficient for four runs of millstones, with the necessary machinery for a grist and flouring mill, " subject to assessment of its just proportion of all expenses on the dam and mill-race that supplied it with water;" but it also contained a further statement that it was estimated by the parties that the whole amount of water in the stream was sufficient for sixteen runs of stone. From this clause the conclusion has been reached by complainant that the " just proportion of repairs " to be borne by him was one-fourth, and the court in its decree accepts this conclusion. If there is error in this the complainant has erred from the beginning; and his error is probably chargeable in some degree at least with the litigation.

It is probable that when Clements conveyed to Bradfield it was expected that the whole water-power in the stream at

the point where the dam and race was constructed, would be sold and utilized. If sales had been made of all with provisions in the deeds in respect to repairs like that in the deed to Bradfield, each purchaser would have been under obligation to make repairs in proportion to the power owned by him, and any prior right to water would have made no difference in this regard. Any expectations of a sale of the whole seems however to have been disappointed. Sufficient power for four runs of stone was sold to Bradfield, and sufficient for three runs to Small, and here the sales stopped. The remainder of the water is not utilized and nothing in this record informs us that any person is under obligation to share the expense of maintaining the dam, except the parties to this suit, and their obligation is not absolute, but only contingent and conditioned on their making use of the water. If complainant should cease to use the water, defendants could not call upon him to aid in making repairs, and if defendants should cease to make use of their mill, the complainant, as we are now advised, would have no alternative but to bear the whole burden.

As the interest of the defendants in the water is one-fourth less than that of complainant, the proportion of the cost of repairs to be borne by them, if the whole power was utilized, would be to that borne by him, as three to four. But it is claimed by complainant and conceded by the defendants, that by his purchase he has acquired a right to the power granted to him which, as respects repairs, is not affected by the sale or failure to sell the remainder, and that as between himself and a subsequent grantee he is entitled to water sufficient for four runs of stone, if he makes the proportion of repairs which is specified in his conveyance. The result of this claim is that defendants, as a condition to obtaining the water needed for their purposes, must bear the burden of all the repairs except to the extent that by the Bradfield conveyance they were thrown upon the grantee named therein. And had there been in the stream the water that was estimated when the Bradfield conveyance was made—namely, sufficient for sixteen runs of stone—

one-fourth the cost of repairs would thus be cast upon complainant and three-fourths for their lesser interest upon defendants.

It appears, however, that the quantity of water in the river is much less than was estimated and instead of being sufficient for sixteen runs of stones, it is only sufficient for ten runs. This deficiency raises the question whether complainant's proportion of repairs is to be estimated according to the water actually in the river or according to the quantity which was erroneously assumed to be there when Clements conveyed. The difference as is evident is very important, as under one view the complainant must bear perhaps two-fifths of the cost of repairs and under the other one-fourth only.

Complainant contends that his "just proportion" of the expenses of repairs is determined by the deed itself whereby there was conveyed to his grantor one-fourth the estimated power. But if the estimate was intended to fix the proportion definitely it is remarkable that the draftsman, instead of saying that the power conveyed shall be subject to assessment for its "just proportion," did not expressly define the proportion and fix the amount definitely, and beyond question at one-fourth the cost. Fewer words than he has employed would have expressed the intent conclusively and directly, while now if it is expressed at all, it is in ambiguous language and by circumlocution. But the terms employed are much better calculated to convey the meaning that the just proportion was subject to contingencies, than that it was definitely fixed and settled by the deed itself. Bradfield purchases power for four runs of stone ; the whole is estimated at sixteen runs, and the grantee shall bear a proportion of the repairs which is not expressly named, but shall be determined by right and justice. An estimate, it is always assumed, may not be accurate, and so long as the quantity is only estimated and not more definitely determined, if it were intended that the grantee shall bear with others a proportional share of the cost of repairs, the proportion could not be more conclusively fixed than by the use

of terms requiring that it should be just. But what would be just could only be determined when the quantity had ceased to be estimated and had become known. And when the quantity is known it is made evident that any apportionment according to the very inaccurate estimate would be altogether unequal and unjust.

But there is the further error in the complainant's view that it assumes that his proportion of keeping the dam and race in repair is just the same when only a part of the power is utilized that it would be if the whole were utilized. This would be so if the same dam and race were required to give to him and to the defendants the power they have purchased that would be necessary to utilize the whole power, but otherwise it would not. The fact that three-tenths or so of the power is now wasted may have an important bearing on this point; for when complainant takes advantage of the fact that the power is not all utilized, to throw upon defendants, as a condition to any use of the water whatever, a proportion of the repairs much larger than he assumes, they have a right to insist that he at least shall not be gainer at their expense, by reason of the same non-use of power whereby they are losers. Now complainant was to have his power subject to an assessment that contemplated the use of all the rest; and if less than all is utilized, at a less cost, the saving does not belong to him but to those who were subsequent purchasers. If he obtains his proportion of the power subject to such proportion of the expense as he must bear if all were utilized, that is all he can claim and all that justice can concede to him.

It may be that there would be no considerable difference in the expense of maintaining the dam and race to give power sufficient for seven runs of stone, or to give all that can be obtained; but the difference in the obligation is not to be overlooked and it is conceivable that it may be of considerable practical importance.

As Bradfield took from Clements no covenant that the latter or his grantees would be at any expense in keeping up the dam and race, it is the good fortune of complainant

that any one else by a subsequent purchase has put himself in position to be under obligation to share with him that expense. But under no circumstances can his just proportion be less than the proportion the 'water he uses bears to the whole water in the stream; and for reasons just given it may be greater if all the power is not utilized.

In *Hoxsie v. Hoxsie* 38 Mich. 78, we had occasion to say that an "injunction ought not to be granted to regulate the relative rights of mill-owners upon the same stream, except in very clear cases of the intentional violation of such rights." This case is a forcible illustration of the remark. The questions at issue are such as the parties ought to settle for themselves; but if this is found to be impossible, it must be because of difference of opinion in respect to their rights and obligations, which in the nature of things cannot be definitely settled by an injunction.

We are of opinion that complainant has failed to make out a satisfactory case for equitable relief. If under the views expressed in this opinion he conceives himself entitled to redress at law, he is at liberty to pursue the legal remedy. If he should recover at law, he might possibly, on the basis of that recovery, have relief in equity.

The decree must be reversed and the bill dismissed with costs of both courts.

The other Justices concurred.

